# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |
|---|
| UNITED WINDOW & DOOR MFG., INC., |
| Plaintiff, |
| v. |
| DECEUNINCK NORTH AMERICA, LLC, |
| Defendant. |

Before: Leo M. Gordon, Judge

Court No. 2:19-cv-06819

## OPINION

[Denying Plaintiff's motion for partial summary judgment and granting in part Defendant's motion for summary judgment.]

Dated: March 17, 2025

Laurence B. Orloff, Orloff, Lowenbach, Stifelman & Siegel of Morristown, N.J., argued for Plaintiff United Window & Door Mfg., Inc.  With him on the briefs were David Gorvitz and Alexander B. Imel.

Ricardo M. DeBari, Thompson Hine LLP of New York, N.Y., argued for Defendant Deceuninck North America LLC.  With him on the briefs was Brian Lamb.

Gordon, Judge[1]: This action involves the breakdown of a long-standing business relationship between Plaintiff United Window & Door, Inc ("United") and Defendant Deceuninck North America LLC ("DNA").  United filed suit against DNA for breach of a purported January 2018 agreement between the parties that set forth terms for United to earn rebates on its purchases of polyvinylchloride ("PVC") extrusions from DNA.  See Compl., ECF No. 1; Supp. Compl., ECF No. 35 (supplementing Complaint to add claim for rebate earned in 2019 under same agreement).  In response, DNA denies

---

[1] The Honorable Leo M. Gordon, Judge of the United Court of International Trade, sitting by designation.

United's claims and brings a counterclaim alleging that United materially breached the parties' pre-existing contractual arrangement in late 2017.  See Answer & Counterclaim, ECF No. 4.

Before the court are the parties' respective motions for summary judgment.  See DNA's Mot. for Summ. J., ECF No. 103 ("DNA's Mot."); United's Mot. for Partial Summ. J., ECF No. 108 ("United's Mot."); see also DNA Br. in Opp'n, ECF No. 111 ("DNA's Resp."); United Br. in Opp'n, ECF No. 114 ("United's Resp."); DNA's Reply, ECF No. 115; United's Reply, ECF No. 116.  The court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332.[2]  The court held oral argument on the motions, and thereafter allowed the parties to each file a supplemental brief.  See Oral Argument, ECF No. 129; see also United's Supplemental Brief, ECF No 130 ("United's Supp. Br."); DNA's Supplemental Brief, ECF No. 133 ("DNA's Supp. Br."); Oral Argument Transcript, ECF No. 134 ("Tr.").  For the following reasons, the court denies United's motion for partial summary judgment and grants DNA's motion for summary judgment as to liability.  Further proceedings are necessary to resolve the appropriate quantum of damages.

## I. Standard of Review

Federal Rule of Civil Procedure 56(a) permits summary judgment when "there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317,

---

[2] United is a New Jersey corporation, and DNA is a Delaware limited liability company that has its principal place of business in Monroe, Ohio.  Both parties claim damages in excess of $75,000.  See Compl. ¶¶ 1, 2, 53; Answer & Counterclaim ¶ 22.

322–23 (1986) (Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").  In considering whether material facts are genuinely in dispute, the evidence must be considered in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Anderson, 477 U.S. at 261 n.2.

## II. Background

The history of the parties' contractual relationship prior to 2016 is largely undisputed.  See DNA's Stmt. of Undisputed Material Facts, ECF No. 104 ("DNA's Stmt."); United's Stmt. of Undisputed Material Facts, ECF No. 106 ("United's Stmt."); see also DNA's Resp. to Pl.'s Stmt. of Undisputed Material Facts & Counterstatement of Undisputed Material Facts, ECF No. 112 ("DNA's Stmt. Resp."); United's Resp. to Def.'s Stmt. of Material Facts, ECF No. 113 ("United's Stmt. Resp."); United's Resp. to Def.'s Counterstatement of Facts, ECF No. 116-1 ("United's Counterstmt. Resp.").  United was a customer of DNA and its predecessor, Vinyl Building Products, for more than 30 years. See United's Stmt. at ¶¶ 6–11; DNA's Stmt. Resp. ¶¶ 6–11.

In 2012, the parties agreed to the latest "'master' terms-and-conditions document," the "Standard Commercial Terms and Conditions" ("SCTC") drafted by DNA.[3]  The SCTC

---

[3] Despite acknowledging the existence of the 2012 SCTC in connection with the parties' contractual arrangement, United highlights that "[n]o SCTC between United and DNA was ever executed by either party."  See United's Stmt. ¶ 17.  DNA does not dispute this point (footnote continued)

"provided for DNA to be United's exclusive supplier of its vinyl extrusions so long as it ordered any such components."  See United Mot. at 1–2 (acknowledging 2012 SCTC as "latest 'master' terms-and-conditions document…provided for DNA to be United's exclusive supplier of its vinyl extrusions so long as it ordered any such components."); see also Compl. ¶ 10 (acknowledging that "the parties operated against the background of certain Standard Commercial Terms and Conditions ("SCTC") promulgated by DNA and agreed to by United"); Tr. 6:4–9 (United's counsel acknowledging that "the terms and conditions spelled out in the SCTC constitute part and parcel" of the parties' agreement); Answer & Counterclaim, Ex. 1.  The SCTC provided the foundation for the parties' contractual relationship, and was revised and amended by subsequent "Addendum Agreements."  See DNA's Stmt. Resp. at 4; United's Stmt. Resp. ¶ 4; United's Counterstmt. Resp. ¶ 1; see also Compl. ¶ 10 ("certain aspects of the relationship were further revised and amended by documents designated as "Addendum Agreements"); Counterclaim ¶ 2.

"Commencing in or around 2016," the relationship between United and DNA began to deteriorate after United sent "written and verbal notifications and complaints to DNA with respect to numerous problems United was experiencing with both the quality of some of DNA's extrusions and the untimely completion of, and delivery of, its product to United, resulting in a lengthy series of 'back orders.'"  See United's Stmt. ¶ 34; see also DNA's

---

as the SCTC was never intended to be executed directly by the parties, but rather its terms were incorporated by reference through subsequently executed addendum agreements.  See DNA's Stmt. Resp. ¶ 17.

Stmt. Resp. ¶ 34 (disputing materiality, consequence, and characterization of United's complaints, but not their existence).  Those issues appear to have persisted throughout 2016 into 2017.  See United's Stmt. ¶ 35; DNA's Stmt. Resp. ¶ 35 (disputed only "insofar as every ordered was ultimately 'fulfilled'").  Despite the ongoing delivery issues, in July 2017, the parties entered into their most recent written contractual arrangement, signing a Rebate Addendum and a Material Credit Addendum, both of which reference the SCTC. See DNA's Mot. at 13 (citing DNA's Stmt. ¶¶ 10–11); see also United's Stmt. Resp. ¶¶ 10-11.  Regardless of entering into those new addenda agreements, United maintains that it continued to notify DNA of problems and issues that "continued and increased throughout 2017."  See United's Stmt.  ¶¶ 35–37.

After numerous exchanges over several months regarding pricing and delivery issues, United notified DNA in the Fall of 2017 of its final decision to enter a business relationship with another PVC company to procure extrusions for three of United's six major window systems.  See United's Mot. at 9; United's Stmt. ¶ 39; see also Answer & Counterclaim ¶ 14.  Representatives of DNA and United subsequently met at DNA's headquarters in Monroe, Ohio, on January 16, 2018 (the "Monroe Meeting"), to discuss the parties' business relationship going forward.  See United Stmt. ¶¶ 41, 43.  Before the meeting, then-President and CEO of DNA, Filip Geeraert, emailed United with a proposed agenda for the meeting, including the "Status Transition Plan" for the three window systems and the "Transition Supply Plan" for 2018, involving pricing and rebates.  See United's Stmt. ¶ 42.  Following the Monroe Meeting, United and DNA exchanged a series

Court No. 2:19-cv-06819                                                      Page 6

of emails (the "Email Exchange") to build on their discussions.  The parties disagree as to the resulting effects of the Monroe Meeting and the Email Exchange.

Thereafter, United continued to purchase all six of its systems from DNA and was paid the rebate for 2017 purchases.  See Compl. ¶ 22. In November 2018, United bought PVC extrusions for the first of its transitioned systems from its new supplier but continued purchasing extrusions for its remaining five systems from DNA.  Id. ¶¶ 23–25; see also Answer & Counterclaim ¶¶ 23–25.  After learning that United had in fact entered into a written agreement with its competitor, DNA sent a letter, on November 29, 2018, notifying United that it would not be paid any rebates for 2018.  See Compl., Ex. B.  The letter also provided that, starting January 1, 2019, DNA would impose new terms and conditions upon all its sales to United.  Id.; see also DNA's Stmt. Resp. ¶¶ 50–51.

United countered, on December 10, 2018, contending that these new terms and conditions were a material change to the purported January 2018 Agreement, and would substantially increase United's costs.  See United's Mot. at 10.  On December 18, 2018, DNA responded, maintaining that no new written contract was ever renegotiated between the parties, and that "United has refused to enter into a written contract or provide a clear commitment regarding current and future supply terms."  See Compl., Ex. D. DNA reasserted its position that United unilaterally breached the 2017 Contract by entering into a supply agreement with DNA's competitor, and that United would not receive any rebate for its 2018 purchases.  Id.  This litigation ensued.

Court No. 2:19-cv-06819                                                    Page 7

### III. Discussion

### A. The SCTC and 2017 Addenda

DNA moves for summary judgment seeking a (1) declaration that United violated the parties' 2017 Contract, (2) monetary damages resulting from that breach of contract, and (3) dismissal of all of United's claims.  See generally DNA's Mot.; Answer & Counterclaim.  DNA argues that it is entitled to this relief as a result of United's violation of the SCTC and the signed 2017 addenda when United entered into an agreement with a third party for provision of some of its PVC extrusions.  See Counterclaim ¶¶ 2–10. United disagrees, arguing that the parties' relationship was informal such that United could terminate the contractual arrangement at will and was never bound by the terms of the SCTC.  See generally United's Mot. at 10–37; United's Resp. at 10–15, 28–40.  United urges the court to deny DNA's motion for summary judgment and instead grant partial summary judgment in United's favor that DNA is liable to United for rebates earned on purchases in 2018.  With this background, the court begins by examining the contractual relationship of the parties as of Fall 2017—the time of the first alleged material breach.

The 2012 SCTC includes various provisions critical to the present dispute.  These include Sections 2, 4, and 5 that provide:

> **2. TERM OF AGREEMENT:** Unless otherwise agreed in writing this Agreement is in effect when DNA accepts by confirmation a properly placed CUSTOMER purchase order and shall continue until that order transaction is completed as provided therein.

**4. PURCHASE AND SALE OF PRODUCTS**: DNA agrees to sell the Products to CUSTOMER, and CUSTOMER agrees to purchase from DNA all of CUSTOMER's requirements for products that are the same or similar to the Products.

**5. NON-EXCLUSIVE RIGHT TO PURCHASE PRODUCTS**: DNA grants CUSTOMER the non-exclusive right to purchase the Products listed in Exhibit A, Attachment I "Price List" as long as the CUSTOMER purchases 100% of CUSTOMER's requirements of products that are the same or similar to the Products from DNA.

2012 SCTC, ¶¶ 2, 4, 5.

The SCTC also contains express provisions limiting and specifying how parties may terminate the agreement in Section 14, which states in relevant part:

**14. TERMINATION:** This Agreement may only be terminated according to these provisions:

14.1 DNA fails to perform. This Agreement may be terminated by CUSTOMER if DNA fails to remedy failure to perform as defined herein, within 90 days from date of receipt of CUSTOMER'S written notice to DNA that provides specific evidence of failure to perform as defined by the following:

a) Quality. DNA fails to provide Products that follow AAMA lineal standards for quality, where applicable.

b) Shipments on-time. If DNA fails to make shipment of Products on-time as defined as follows: 90% of all properly placed orders shipped within three weeks after receipt of order for a period of ninety (90) consecutive days.

c) Orders complete. If DNA fails to ship properly placed orders for Products complete as measured on a line item basis at least ninety percent (90%) of all Products ordered, for a period of ninety (90) consecutive days.

2012 SCTC, ¶¶ 14 & 14.1.

Finally, Section 15 of the agreement includes miscellaneous topics:

## 15. GENERAL PROVISIONS:

15.1 ENTIRE AGREEMENT. This Agreement and any properly executed Addendum(s) to this Agreement shall constitute the entire agreement between the parties relating to the subject matter hereof, and all prior negotiations, representations, agreements, and understandings are merged into, extinguished by, and completely expressed by this Agreement.

15.2 NOTICES: All notices pursuant to this Agreement shall be in writing and shall be deemed properly delivered when sent by registered, overnight or certified mail…

15.5 WAIVER: The failure of either party to enforce any or all of the provisions of this Agreement or to exercise any right which is provided herein shall in no way be construed to be a waiver of such provision or provisions nor in any way to affect the validity of this Agreement or any part hereof or the right of either party to enforce thereafter every such provision and to exercise every such right. No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach. Nothing shall constitute a waiver except an instrument in writing signed by duly authorized officer of the party against whom such waiver is sought to be enforced and which expressly, and not implicitly, waives a right or rights hereunder.

15.8 INTEGRATION: The Agreement and any properly executed Addendum shall constitute the entire agreement of the parties with respect to the subject matter hereof. This Agreement may not be released, discharged, abandoned, changed, modified, amended or altered in any matter except by an instrument in writing signed by a duly authorized officer or agent of each of the parties hereto. This Agreement shall supersede the terms of any purchase order or sales order acknowledgement issued by the parties in connection with the sale and purchase of Products. In the event the Addendum is in conflict or contains terms different than the terms provided in this Agreement or any purchase order, in either case, the terms of the Addendum shall be controlling. In the event that terms of any purchase order or sales order acknowledgement

> are in conflict with or are different than the terms provided
> herein, the terms hereof shall be controlling.

2012 SCTC ¶¶ 15.1, 15.2, 15.5, 15.8.

In addition to the 2012 SCTC, the parties agree that two most recent written addenda to their contractual arrangement were signed in July 2017. See DNA's Stmt. ¶ 10; United's Stmt. Resp. ¶ 10. The April 2017 Rebate Addendum amended Section 2 of the SCTC (defining Term of Agreement) and provided that "[t]he provisions of this Addendum are effective as of July 10, 2017 ('Effective Date') and shall continue until December 31, 2022 ('Initial Term') unless properly terminated earlier." See United's Stmt., Ex. 24 ("Rebate Addendum"). The July 2017 Material Credit Addendum "had identical amendatory language, except that it indicated that "provisions of [that] Addendum [would] continue until December 31, 2019." See United's Stmt., Ex. 25 ("Material Credit Addendum"); United's Mot. at 27 n.7. DNA highlights that the two-page Rebate Addendum repeatedly references the SCTC and specifically states that "[t]he terms and conditions of the SCTC Agreement are incorporated herein by reference and made a part hereof." DNA's Mot. at 13–14. "Additionally, the Material Credit Addendum (like the Rebate Addendum) expressly incorporates by reference the SCTC Agreement and refers to the SCTC Agreement at least 10 times, including in the title of the document." Id. at 14.

In its motion for summary judgment, DNA states that, "under Ohio law, the SCTC Agreement, the Rebate Addendum and the Material Credit Addendum are legally one agreement, the '2017 Contract.'" See DNA's Mot. at 1 n.1, 14 (citing Bennett v. KeyBank,

N.A., 2020-Ohio-1152, 2020 WL 1492573, at ¶ 24 (Ohio Ct. App. Mar. 27, 2020) for proposition that "separate agreements may be incorporated by reference into a signed contract…. The parties to the contract need not separately execute the incorporated document in order to be bound by its terms"). DNA contends that the 2017 Contract is a "requirements" contract that obligated United to use good faith to purchase all of its requirements from DNA during the "term" of the agreement. See id. at 4; see also DNA's Resp. at 25 (explaining exclusivity as core element of any requirements contract, citing H & C Ag Servs., LLC v. Ohio Fresh Eggs, LLC, 2015-Ohio-3714, ¶ 44 (Ohio Ct. App. 2015)).

"To declare the existence of a contract," the proponent of a contract must show that (1) "the parties to the contract must consent to its terms," (2) "there must be a meeting of the minds of both parties," and (3) "the contract must be definite and certain." DNA's Mot. at 24 (quoting Purdin v. Hitchcock, No. CA 531, 1993 WL 19508, at *3 (Ohio Ct. App. Jan. 21, 1993)). There is no dispute that the parties signed and agreed to the Rebate and Material Credit Addenda in July 2017. See, e.g., United's Mot. at 23; DNA's Mot. at 3. Although United acknowledges that the Rebate and Material Credit Addenda "referenced the SCTC," United is not willing to concede the legal point that the SCTC was "incorporated by reference." See United's Stmt. Resp. ¶ 11. United maintains that "there is no such '2017 Contract'" and instead "[t]he arrangement between DNA was, in reality, an indefinite requirements arrangement." United's Resp. at 10. Accordingly, the court must first resolve the disputed issue of law as to the existence of the contract.

United does not further explain or provide citation for what constitutes an "indefinite requirements arrangement" under Ohio law, nor does it explain why the terms of the SCTC would not bind United despite its express reference in the addenda agreements. Id.  Rather, United quickly moves on to its alternative arguments as to why it should not be liable for its alleged violation of terms of the SCTC.  Id. at 11.  DNA contends that "United's ostrich-defenses were squarely rejected in [Brown v. Emery Fed. Credit Union, 2022 WL 991387, at *9 (D. Md. Mar. 31, 2022) (applying Ohio law to contract evaluation)], which held that under Ohio's incorporation by reference doctrine, 'when a document is incorporated into a contract by reference, that document becomes part of the contract.'" DNA's Reply at 2.  In Brown, the court observed that "[t]he parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document, including . . . a separate document which is unsigned, if the contract makes clear reference to the document and describes in such terms that its identity may be ascertained beyond doubt."  Brown, 2022 WL 991387, at *9.  DNA maintains that "[l]ike in Brown, by signing the Addenda, United agreed to the clearly described and oft-referenced SCTC Agreement, and it therefore promised to be bound by each of its terms, including its Termination Clause and exclusivity/requirements obligations."  DNA's Reply at 2.

DNA rejects United's suggestion that the parties were in an "indefinite requirements arrangement," and maintains instead that the "2017 Contract is enforceable as a requirements contract."  DNA's Resp. at 5.  DNA further explains that "[u]nlike the common law, the Ohio Uniform Commercial Code does not require that all essential terms

of a contract be definite in order for the contract to be enforceable." Id. at 6 (quoting Premier Constr. Co. v. Maple Glen Apts. & Townhouses Ltd., 2020-Ohio-4779, ¶ 24 (Ohio Ct. App. 2020)).  DNA elaborates that the only term required is the quantity term. Id. (citing Ohio Rev. Code Ann. ("R.C.") § 1302.04, cmt. 1).

As described above, the 2012 SCTC provides that the parties agreed to an exclusive "requirements contract." See 2012 SCTC ¶¶ 4, 5.  DNA contends that the Ohio Uniform Commercial Code ("UCC") "permits buyers and sellers to enter into requirements contracts in which the parties agree to measure the term of their agreement by either a seller's output or a buyer's requirements rather than by a specific quantity."  DNA's Resp. at 6 (quoting NSK Indus. v. Bayloff Stamped Prods. Kinsman, 2010-Ohio-1171, ¶ 23 (Ohio Ct. App. 2010)).  DNA maintains that the 2012 SCTC's "requirements language reflects the standard mandatory language of requirements contracts."  Id. (citing Fuchs v. United Motor Stage Co., 135 Ohio St. 509, 513 (Ohio 1939)); see also id. at 25 (explaining exclusivity as core element of requirements contract, citing H & C Ag Servs., LLC, 2015-Ohio-3714, ¶ 44 (Ohio Ct. App. 2015)).

United's response to the recitation of these contractual terms is scattershot and often confused.  See, e.g., United's Mot. at 4, 14 (appearing to argue that SCTC terms do not bind United because SCTC was never signed); id. at 25 (arguing that only some of the SCTC terms were incorporated by reference when parties executed addenda agreements).  Given all of the above, the court agrees with DNA that, under Ohio law, the SCTC, the Rebate Addendum, and the Material Credit Addendum are legally one agreement—the 2017 Contract.  United's arguments attempting to avoid liability under

the provisions of this contract are without merit.  As DNA explains, "[w]hile the SCTC Agreement was never intended to be signed—it does not have signature blocks—the Addenda <u>were</u> signed.  United's execution of 10 addenda incorporating the SCTC Agreement over the course of 8 years provided it with more than ample opportunity to ask questions about the SCTC Agreement prior to signing the Addenda."  DNA's Reply at 2 (citing <u>Cheap Escape Co. v. Crystal Windows & Doors Corp.</u>, 2010-Ohio-5002, ¶ 17 (Ohio Ct. App. 2010), holding that a "party entering a contract has a responsibility to learn the terms of the contract prior to agreeing to its terms" and is presumed to have read and understood the terms and is bound by a contract that he willingly signed").

As for United's argument that only some of the SCTC's terms were incorporated in the 2017 Contract, DNA concisely summarizes the problem with that position: "[o]n the one hand, United cannot concede that the SCTC Agreement's 'requirements' provision is in force, lest it be in flagrant breach of its purchase obligations to DNA and subject to that agreement's Termination Clause.  Yet, on the other hand, if the SCTC Agreement's 'requirements' provision is not part of the overall agreement, the essential contract term of 'quantity' is lacking, and the parties would have had no valid and enforceable agreement."  DNA's Resp. at 3.  Ultimately, the court agrees with DNA that the undisputed facts on the record demonstrate that the parties entered into the 2017 Contract.

Having addressed the key elements of the parties' requirements contract, there remains the issue of the agreed-upon term or duration of the 2017 Contract.  <u>See</u> United's Mot. at 14 (arguing that 2017 Contract was terminable at will because it has "no temporal contract term at all," thus entitling United to terminate 2017 Contract upon reasonable

notice pursuant to UCC § 2-309); id. at 25 (alternatively arguing that 2017 Contract end date was 2019 per Material Credit Addendum); see also DNA's Mot. at 4–5 (arguing that term of 2017 Contract was provided by July 2017 Rebate Addendum, with end date of December 31, 2022). DNA, relying on the support of the undisputed terms of the addenda agreements, explains that the term of the parties' contractual arrangement was set by the addenda agreements executed by the parties that explicitly referenced the SCTC. See DNA's Reply at 4 (arguing for interpretation of addenda together with SCTC's termination and term provisions to determine existence of "multi-year fixed term [requirements] contract"). Perhaps recognizing the absurd result that would follow if the parties' agreement had "no temporal contract term at all," United argues that "even if DNA were correct that the fixed term of the April 2017 Rebate Addendum governed all the parties' purported obligations under the 2012 SCTC, the fixed term to which the parties would have been subject during the events giving rise to this dispute would have ended in 2019, not in 2022." See United's Mot. at 25 (arguing that Material Credit Addendum's term superseded term of Rebate Addendum due to later execution of Material Credit addendum). DNA maintains that the court should conclude that the end date for the 2017 Contract was in 2022 per the Rebate Addendum. See DNA's Resp. at 18–20 (arguing that applying 2019 end date from Material Credit Addendum, after the parties had just the same day signed an addendum providing for longer term, would be absurd). Given that United at least acknowledges a potential fixed-term contract end date of 2019, see United's Mot. at 25, the court will reserve decision as to whether the precise end date of

Court No. 2:19-cv-06819                                                    Page 16

the contract was in 2019 or 2022.  This issue, along with the related measure of the appropriate quantum of damages, is resolvable after further proceedings.

Having established the key terms of the parties' contractual arrangement, the court turns to DNA's motion for summary judgment for its counterclaim alleging breach of the 2017 Contract.

### B. DNA's Motion for Summary Judgment on its Counterclaim

While United filed the operative complaint and is designated as the Plaintiff in this matter, the factual background demonstrates why it is logical to start with adjudication of DNA's motion for summary judgment, as the events and contractual arrangements underpinning DNA's claim pre-date the 2018 negotiations central to Plaintiff's affirmative partial summary judgment motion.  Compare DNA's Mot. at 12–23 (seeking judgment on counterclaim for United's alleged breach of the "2017 Contract"), with United's Mot. at 37-40 (providing less than three-page argument for relief "on its affirmative claim for breach of contract with respect to the rebate due and owing to United based upon its purchases from DNA in 2018, as embodied in the Third Count of the Complaint").  DNA maintains that given United's failure to comply with the express provisions governing exclusivity and termination, DNA should prevail on summary judgment.  See DNA's Mot. at 12–23.

Under Ohio law,[4] to prevail on a breach of contract claim, the claimant must establish by a preponderance of the evidence that: (1) a contract existed; (2) the claimant fulfilled its obligations; (3) the defendant breached its obligations; and (4) damages resulted from this breach. See DNA's Mot. at 12–13 (citing Hopkins v. Car Go Self Storage, 2019-Ohio-1793, 135 N.E.3d 1229, 1233, ¶ 13 (Ohio Ct. App. 2019)). Here, DNA argues that: (1) the parties agreed to the terms set forth in the three agreements (SCTC, Material Credit Addendum, and Rebate Addendum), comprising the "2017 Contract," (2) DNA fulfilled its obligations under the 2017 Contract, (3) United materially breached the exclusivity requirement of that Contract by obtaining similar products from a third party, and (4) DNA suffered damages in the form of lost profits as a result. See id. at 13–22.

United summarizes its argument against liability on DNA's counterclaim simply as follows:

> 1. Assuming but not conceding the applicability of the unsigned 2012 SCTC, the "requirements contract" contained therein could be terminated by either party upon reasonable notice under the circumstances, and United in this case afforded DNA more than reasonable notice of more than a year;

---

[4] While both sides make some references to New Jersey law and precedent, the parties appear to agree that Ohio law should be applied for resolving this matter. See United Mot. at 15 n.3 ("United cites to both New Jersey and Ohio law in this brief out of an abundance of caution, in that the unsigned SCTC calls for the application of Ohio law with respect to the issues germane to this motion. United does not perceive any meaningful distinction between the law of the two jurisdictions."); DNA Mot. at 13 n.3; see also 2012 SCTC ¶ 15.9 ("GOVERNING LAW: This Agreement shall be construed and interpreted in accordance with the laws of the State of Ohio…."). Given that the parties' contract calls for the application of Ohio law, the court does not address the parties' arguments as to New Jersey law.

2. DNA's reliance upon the April 2017 Rebate Addendum as extending the parties' rights and obligations to December 31, 2022 fails for a number of reasons, including the facts that:

(a) That addendum, as well as the other addenda, contain "end dates" that apply only to the subject matter of the particular addendum and not to all of the alleged rights and obligations under the 2012 SCTC, and in the case of the April 2017 Rebate Addendum, the "end date" relates only to dollars and percentages under a "Volume Rebate Program" and not to anything else; [and]

(b) Paragraph 1 of the April 2017 Rebate Addendum states that "the provisions of this Addendum" "***shall continue until December 31, 2022**," thus confirming that the "end date" referred only to the "volume rebate" issue and nothing else;

(c) As admitted by DNA in Paragraph 3 of its Counterclaim, the addendum effective July 10, 2017 ("July 2017 Material Credit Addendum"), and not the April 2017 Rebate Addendum, was the last or "most recent" addendum executed by the parties and, by its terms, "the SCTC Agreement as amended by this addendum shall supercede all previous agreements between the parties***." Thus, as DNA alleges and United denies, if the "end dates" in fact were applicable to the entire relationship between the parties, the July 2017 Material Credit Addendum contained an "end date" of December 31, 2019, making it, and not December 31, 2022, the governing termination date.

(d) Notwithstanding the above, any and all of the rights and obligations of the parties were superceded and replaced by the January 2018 Agreement, in which they agreed to move forward without a written contract, thereby extinguishing any alleged obligations under the 2012 SCTC or Addenda.

United's Mot. at 8–9 (emphasis in original, footnoted omitted).[5]

---

[5] United's full argument summary contained five points, but the remaining three all hinge on the existence of a "January 2018 Agreement." See id. at 9–10 ("In any event, any (footnote continued)

As to the first element of DNA's breach of contract claim, United maintains that "DNA cannot show, as a matter of law, the existence of any contract obligating United to purchase its requirements of vinyl forms from DNA through 2022, or for any fixed length of time, at the relevant time, precluding it from establishing the necessary element of a valid contract." United's Mot. at 13. The court disagrees, having determined as a matter of law that the parties had a contractual relationship, i.e., the 2017 Contract, that provided the basis for DNA's breach of contract claim for the reasons set forth above in Section III.A. Therefore, the court turns to the next element—the claimant DNA's satisfaction of its obligations under the 2017 Contract.

DNA maintains that "at all times relevant to the dispute, DNA was ready and willing to perform its duties under the 2017 Contract." DNA's Mot. at 17. DNA emphasizes that "even after United committed a breach of the 2017 Contract by failing to purchase all of its requirements from DNA, DNA still continued to supply United's vinyl orders as they came in." Id. (citing DNA's Stmt. ¶¶ 54, 61). DNA further notes that "at no point in the

---

rights and/or obligations that would arguably have been created by the 2012 SCTC, and/or Addenda, were superceded by the parties' agreement in January, 2018 [sic] that they would no longer operate under those documents and that they would proceed to deal with each other in accordance with their email exchange, comprising what United has labelled the 'January 2018 Agreement'…DNA materially breached a key term of the January 2018 Agreement by refusing to pay United any rebate based upon 2018 sales from DNA to United…DNA's material breach of the January 2018 Agreement not only entitled United to damages but also excused United from any further obligations, if any, to DNA as claimed by DNA in its Counterclaim."). The court addresses the existence of the January 2018 Agreement in Section III.C, and does not address Plaintiff's arguments depending on the existence of that agreement here for the reasons provided therein. See Section III.C infra (rejecting United's arguments as to the existence of a January 2018 Agreement).

Monroe Meeting did any party purport that the 2017 Contract was terminated based on DNA's failure to perform." Id. (citing DNA's Stmt. ¶ 33.).

United responds that DNA cannot prevail at summary judgment on its counterclaim because there remain issues of material fact as to whether DNA "fulfilled its obligations" under the contract as required to recover on a breach of contract claim. See United Resp. at 32–34. Specifically, United contends that DNA's admitted "back order issues" vitiate any suggestion that DNA shipped its products on-time as required by the terms of the 2012 SCTC. Id. at 32–33. United argues that "record evidence suggests that there were many periods during which [DNA] shipped little, if anything, on time to United." Id. at 33. United thus urges the court to conclude that these "issues of fact regarding DNA's performance lead inexorably to issues of fact regarding United's breach." Id. United maintains that "[t]he question of whether United's written complaints substantially complied with the 90-day failure-to-perform notice provision requires the review of many communications, testimony as to their effect, and evidence of the degree and timing of any cure, defying resolution as a matter of law." Id. United therefore argues that "genuine issues of material fact as to both DNA's performance and United's breach prevent summary judgment in favor of DNA on this basis." Id. at 34.

DNA disagrees, emphasizing that it is undisputed that DNA fulfilled all purchase orders placed by United under the 2017 Contract. See DNA's Reply at 5–7 (citing DNA's Stmt. ¶ 61 & United's Stmt. Resp. ¶ 61). DNA explains that United's argument relying on the "failure to perform" provision in the Termination Clause of the SCTC is unavailing because "[t]hose benchmarks only applied to potential termination of the 2017 Contract,

which also required giving DNA an opportunity to cure. If United believed that DNA did not meet any of the performance metrics found in the Termination Clause, it could have terminated the 2017 Contract on these grounds." Id. at 6 (internal citations omitted). As United failed to do so, DNA maintains that United cannot use the language of this provision to now serve as a form of "evidentiary hurdle for DNA to satisfy to be compensated for United's anticipatory repudiation." Id.

DNA acknowledges that United "had complained of performance issues before and during the [Monroe Meeting]," but maintains that "United's complaints do not suffice to terminate the 2017 Contract or otherwise relieve United of its purchase obligations—negotiated just two months prior—as a matter of law for three reasons." DNA's Mot. at 17. DNA's three reasons are:

> First, it is undisputed that DNA diligently worked to remedy—and in fact did remedy—the back order issues complained of, undermining any claim of material breach. In fact, DNA has met its purchase obligations for United at all relevant times—fulfilling all orders before and after the parties' oft-discussed Monroe Meeting.
> Second, even if the back order time issues were not being fixed, under the 2017 Contract, United's grounds to terminate were enumerated and agreed-upon. United's guise for trying to extract better pricing—the supposed performance issues—do not provide grounds for termination or allow it to get out of the 2017 Contract's terms. The 2017 Contract, in the SCTC Agreement, contains a Termination Clause providing it "may only be terminated" according to specified grounds. A termination premised on DNA's failure to perform, must satisfy the definition of a "failure to perform." The Termination Clause's explanation of a failure to perform "defined herein" is as follows: (i) DNA fails to meet AAMA lineal standards of quality; (ii) if it fails to meet the 90% threshold of properly placed orders within three weeks after receipt of order for a period of 90 consecutive days; or (iii) if it

fails to ship orders as measured on a line item basis at least 90% of all Products ordered for a period of 90 days. For product performance issues that do not arise to the above-thresholds, termination of the agreement was unavailable; however other terms included remedial measures and processes to address such deficiencies within the contract framework.

DNA was never alleged to have violated the grounds set forth in Section 14.1 and, in fact, United never once articulated the specific grounds it supposedly relied on to claim breach. In fact, Nick Derrico of United told Greg Koch of DNA at the April 2018 Meeting that if DNA had split the difference from the 20% lower pricing that Vision was offering, or in other words if DNA offered a 10% discount, then DNA and United could have reached a new agreement. Mr. Derrico flatly conditioned United's cooperation on pricing, not fixing alleged performance issues, once again illustrating that United was wrongfully attempting to extract better pricing from DNA. Any alleged performance issues cannot justify United's breach when its true motivation behind the entire dispute is evident.

United is not permitted to disregard the contract's plain terms governing what permits a customer to be relived of its performance obligations if it claims that DNA failed to perform. A disagreement between the parties over the proper interpretation of a contract does not necessarily mean that a contract is ambiguous. AdvanSix Inc. v. Allianz Glob.al Risks US Ins. Co., No. 2:21-cv-07962-MCA-CLW, 2023 U.S. Dist. LEXIS 6518, at *6–7 (D.N.J. Jan. 13, 2023) (citation omitted). Under Ohio law, where parties enumerate specific grounds for termination in a contract, strict adherence to those grounds is required. See MCM Home Builders, LLC v. Sheehan, 2019-Ohio-3899, ¶¶ 7, 71 (Ohio Ct. App. 2019) (upholding the jury's verdict finding the contract was terminated not in accordance with the contract's terms); see also Mangan v. Prima Constr., Inc., No. C-860234, 1987 Ohio App. LEXIS 6375, at *4–6 (Ohio Ct. App. Apr. 8, 1987) (strictly construing enumerated grounds for termination and reversing trial court decision finding that contract was properly terminated).

Moreover, even if United wished to terminate the contract for some enumerated reason, United failed to give DNA the requisite written notice providing evidence of DNA's failure to perform and allow a 90-day opportunity to cure. Ohio

> law treats contract provisions requiring written notice and the opportunity to cure as essential terms. See, e.g., Kashmer v. Infrared Imaging Sys., No. 09-CVH-03 440, 2011 Ohio Misc. LEXIS 18240, at *8–9 (Ohio Ct. Common Pleas 2011). A party's failure to abide by such terms is in itself a material breach of the agreement. See id. (granting summary judgment "in favor of Plaintiff on his breach of contract claim" because, inter alia, "Defendant provide[d] no evidence that it gave Plaintiff notice to cure … conduct" and "[b]ecause such notice is required under the contract, Defendant's claims must also fail for this reason."). Thus, United's admission that it "never provided written notice to DNA that set forth that United would terminate the SCTC Agreement and July 2017 Addendum if DNA did not remedy an alleged breach within 90 days" is fatal to its argument that the 2017 Contract was not in force. In fact, United breached the agreement by purporting to terminate it based on grounds unavailable under the 2017 Contract's plain terms and without giving the required opportunity to cure. See Kashmer, 2011 Ohio Misc. LEXIS 18230, at *8.

DNA's Mot. at 17–20 (internal citations to DNA's Stmt. omitted).  United has no persuasive response to DNA's arguments regarding the termination provision of the SCTC.  As DNA points out, "United never once asserted that DNA's performance excused payment for the products delivered [and] the SCTC Agreement provided a specific mechanism to address return of products that 'do not conform' or for undamaged product United sought to return."  DNA's Reply at 6. (citation omitted).  The undisputed facts before the court simply do not support United's conclusory assertion that DNA is unable prevail on a breach of contract claim due to its own failure to perform its obligations.

Turning to the issue of material breach, DNA contends that United's announcement of its intent to move some of its purchases of PVC extrusions to a third-party supplier in Fall of 2017 constituted anticipatory breach of the 2017 Contract.

Court No. 2:19-cv-06819                                                    Page 24

See DNA's Mot. at 6, 16 (citing DNA's Stmt. ¶ 29).  United responds that "the arrangement reflected in the unsigned 2012 master document at best constituted a requirements agreement for an indefinite term, which by law could be cancelled at will on reasonable notice…."  See United's Mot. at 4.  Further, United maintains that even if there was an enforceable contract between the parties in Fall of 2017, any and all contractual obligations United had towards DNA were "extinguished by United's reasonable notice of the termination in the fall of 2017 or by the novatory effect of the January 2018 Agreement."  United's Resp. at 28–29.

DNA emphasizes that United's position that the contract was terminable at will after reasonable notice runs contrary to the plain language of the SCTC requiring a signed writing to alter or terminate the agreement.  See DNA's Mot. at 25 (explaining that "Section 15.8 of the SCTC Agreement provides: 'This Agreement may not be released, discharged, abandoned, changed, modified, amended or altered in any manner except by an instrument in writing signed by a duly authorized officer or agent of each of the parties hereto.'" (citing DNA's Stmt. ¶ 46)).  United nevertheless maintains that DNA cannot rely on the strict termination provisions of the SCTC to avoid United's right to terminate the contract at will under Ohio law.  See United's Mot. at 13–22 (citing Trient Partners I Ltd. v. Blockbuster Ent. Corp., 83 F.3d 704, 709 (5th Cir. 1996) and Opportunity Aviation, LLC v. Flight Options, LLC, No. A-06-CA-316 LY, 2007 WL 1341471 (W.D. Tex. May 4, 2007)); United's Resp. at 12; United's Reply at 6–8.  United argues that termination provisions have limited effectiveness under Ohio law where the parties' agreement "is otherwise indefinite in duration and terminable at will."  United's Mot. at 16. (quoting

Opportunity Aviation, 2007 WL 1341471 at *4).  United also highlights that Section 2-309 of the UCC "specifically provides for at-will terminations of contracts calling for repeated performance without a defined term, subject only to a reasonable notice requirement." Id. at 17 (citing Ohio R.C. § 1302.22 (B)–(C)).

Problematically for United, neither the precedent, nor the cited UCC section, appear to apply to the parties' agreement and dispute.  Starting with UCC Section 2-309, DNA points out that that section is explicitly intended to act as a "gap filler" where the parties' agreement has no specific time provisions.  See DNA's Resp. at 13, 16 n.6.  Given that the 2017 Contract contained express language as to timing for notice and termination, the court agrees with DNA that UCC § 2-309 does not apply.

Further, United's reliance on Trient and Opportunity Aviation is unavailing.  As DNA explains, the circumstances and termination clause at issue in the cited precedent were significantly distinguishable from the provisions of the 2017 Contract.  See DNA's Resp. at 14–16.  In those decisions, the court was confronted with contracts with vague terms and indefinite durations, situations that are not present here despite United's arguments to the contrary.  See Section III.A. supra, concluding definite terms and duration of 2017 Contract were agreed upon and set down.  Here, the 2017 Contract had a set duration (of either 2019 or 2022 per the terms agreed upon in the 2017 Addenda), as well as several express terms as to notice, exclusivity, and termination in the incorporated SCTC.

While the parties quibble over the reasons for United's decision to switch to a third-party supplier, there is no dispute that United affirmed its decision to proceed with the switch in Fall of 2017.  Compare DNA Stmt. ¶¶ 25 & 28, with United's Stmt. Resp.

¶¶ 25 & 28 (admitting that "United did explore a second supplier in 2017," but denying pricing rationale posed by DNA).  Regardless of the (factually-contested) motivation behind United's decision to switch to a new supplier, it is clear as a matter of Ohio law that United's decision to commence purchasing PVC extrusions from a third-party constituted an anticipatory breach of the parties' contractual terms.  As DNA explains, "United repudiated the agreement by conditioning its performance under the 2017 Contract on DNA providing lower pricing terms that contradicted the agreement reached just months earlier."  DNA's Mot. at 16 (citing Sherwin-Williams Co. v. Dynamic Auto Images, Inc., No. SACV 16-1792 JVS (SSx), 2017 U.S. Dist. LEXIS 174303, at *104 (C.D. Cal. Mar. 10, 2017), which applied Ohio law and found that repudiation occurred when defendant's statements "demonstrate[d] that [the defendant] will not stand by the current agreement with [plaintiff] unless the parties agree to new terms that go beyond the Second Amended Agreement").  DNA further notes that under Ohio law, "[u]pon anticipatory repudiation by a party to a contract, the non-repudiating party can wait a commercially reasonable time for the repudiating party to perform.  The aggrieved party may suspend his own performance while he negotiates with, or awaits performance by, the other party."  Id. at 16 (citing Benatty Corp. v. Transatlantic Energy Corp., No. 94-CA-12, 1994 WL 668103, at *2 (Ohio Ct. App. Nov. 8, 1994), and R.C. 1302.68(A)).  In DNA's view, based on the uncontested facts, United anticipatorily breached its exclusive requirements contract with DNA when it declared its intent to commence purchasing from a third-party PVC extrusion supplier.

United also cannot hide behind its claim that, "[t]o the best of United's knowledge, information and belief, it did not review the details of DNA's SCTC until late 2017, when a copy was transmitted to United by Mr. Metzger, a DNA representative." See United's Stmt. ¶ 18. As DNA correctly notes, knowledge is imputed under the law when a party signs a contract. DNA's Stmt. Resp. ¶ 18 (further noting that United signed addendum agreements incorporating SCTC multiple times since 2012, and DNA provided previously provided copies of SCTC including in 2016). Thus, "courts routinely hold that it is a party's choice not to read the terms of documents before signing and they are nevertheless enforced." DNA's Mot. at 14 (citing Cheap Escape Co. v. Crystal Windows & Doors Corp., 2010-Ohio-5002, at ¶ 17 (Ohio Ct. App. 2010) ("A party entering a contract has a responsibility to learn the terms of the contract prior to agreeing to its terms"), and Preferred Cap., Inc. v. Power Eng'g Grp., Inc., 2007-Ohio-257112, ¶ 10 (Ohio 2007) ("parties to contracts are presumed to have read and understood them")). Further, "a party to a contract, which incorporates terms contained in another document, has a duty to review the contract and those documents incorporated into it before signing the contract." Id. (citing Bennett, 2020-Ohio-1152, ¶ 24). Accordingly, the court concludes that United materially breached the terms of the 2017 Contract by declaring its intention to purchase PVC extrusion products from a third-party supplier.

Even assuming the court finds that United breached the parties' 2017 Contract, United posits two additional arguments as to why the post-breach conduct of the parties may relieve United of any liability. Specifically, United contends that either (1) the 2018 Monroe Meeting and subsequent Email Exchange constituted a novation of the

pre-existing contractual arrangement between the parties that in turn extinguished any prior contractual obligations, or (2) DNA's post-breach conduct and negotiations with United should estop DNA from recovering on a claim for breach of contract.  See United's Mot. at 32–37; United's Resp. at 28–32.

As to its novation argument, United explains that under Ohio law, "a novation substitutes a new contract and extinguishes the old one."  United's Mot. at 33 (citing 216 Jamaica Ave., LLC v. S & R Playhouse Realty Co., 540 F.3d 433, 436 (6th Cir. 2008)).  A novation is created "where a previous valid obligation is extinguished by a new valid contract, accomplished by substitution of parties or of the undertaking, with the consent of all the parties, and based on valid consideration."  DNA's Resp. at 22 (quoting PNC Bank, N.A. v. Price, 2016-Ohio-2887, ¶ 41 (Ohio App. Ct. 2016)); see also United's Mot. at 33 ("novation takes place where there is a previous contract; an agreement to make a new contract; a valid new contract; and an intent to extinguish the old contract").

United contends that the undisputed facts on the record demonstrate that the January 2018 Monroe Meeting and Email Exchange resulted in a novation and implementation of the "January 2018 Agreement."  See, e.g., United's Mot. at 34–36. United argues that the substantial terms of a new agreement were set forth in the parties' emails, confirming abandonment of the old arrangement and a new agreement for the parties' relationship going forward.  Id. at 34 (citing Walbridge Indus. Process, LLC v. Vaughn Indus., LLC, 472 F. Supp. 3d 420 (N.D. Ohio 2020) for proposition that contract is enforceable "where all the substantial terms of a contract have been agreed on and there is nothing left for future settlement").  United maintains that "the January 2018

Court No. 2:19-cv-06819                                                      Page 29

Agreement set forth 'all the substantial terms' necessary for the payment of rebates by DNA to United, providing — by reference to a schedule contained in the April 2017 Rebate Addendum — the level of purchases necessary to qualify and the amount of the rebate as a percentage of those purchases, and the appropriate timing of the payment." Id. at 34–35.

DNA emphasizes that "[w]here there is a lack of clear evidence of a novation, Ohio courts will reject a defense that a subsequent agreement is a novation." DNA's Resp. at 22 (citing JDH Mgmt. Grp., LLC v. Pierce, 2018-Ohio-706, ¶ 15 (Ohio Ct. App. Feb. 26, 2018)). DNA also highlights that the court in Walbridge clarified that the informal contract before it was only binding due to "the absence of a positive agreement that it should not be binding until so reduced to writing and formally executed." DNA's Reply at 8 n.9 (quoting Walbridge, LLC, 472 F. Supp. 3d at 425)). Here, DNA maintains that United cannot establish a novation as United is unable to demonstrate: "(1) adequate consideration existed for the new agreement; (2) DNA consented to it; and (3) the parties intended to 'completely disregard the original contract obligation.'" Id. at 22–23 (quoting PNC Bank, N.A., 2016-Ohio-2887, ¶ 43).

As noted above, valid consideration is a core element for establishing a novation. DNA argues that United "has not attempted to explain how there was consideration for the supposed novation of the 2017 Contract terms and arrival at a new agreement in the January 2018 Negotiations." DNA's Resp. at 23; see also DNA's Reply at 8. DNA maintains that United has failed to explain how the purported January 2018 Agreement provided any change in DNA's obligations that would qualify as consideration for

novation.   DNA's Resp. at 23.   United counters by highlighting that "discharge of the existing obligation of a party to a contract is sufficient consideration for a contract of novation."   United's Reply at 12 (quoting Lang v. D&J Homes, 494 F. Supp. 2d 799, 808 (S.D. Ohio 2007)).   Thus, United maintains in rather conclusory fashion, that "both DNA and United have paid consideration for the January 2018 Agreement through the mutual discharge of duties under the old contract."   Id. at 12 n.8.   United elaborates that

> Under the prior agreement, as interpreted by DNA, United was obligated to purchase and DNA was obligated to sell all of United's requirements for vinyl extrusions. Under the January 2018 Agreement, DNA's obligation became more limited. It was only obligated to sell the three transferring systems until they were transferred and thereafter would only be required to sell the three remaining systems to United. United thus discharged DNA's obligations under the prior agreements, while DNA discharged United from the obligation of purchasing all systems from DNA. As there was a mutuality of discharge, the January 2018 Agreement was supported by valid consideration.

United's Reply at 12–13 (internal citations omitted).   United's suggested consideration is entirely illusory given that DNA was actively seeking to keep all of United's business exclusive.   Accordingly, the court agrees with DNA that that the alleged January 2018 Agreement was not supported by consideration, and therefore cannot constitute a valid, enforceable contract.

Critically, United also cannot demonstrate that DNA consented to the novation and the terms of the purported January 2018 Agreement.   DNA notes that United cannot prevail on this element due to the integration clause of the SCTC, which expressly forbid modifications to the parties' contractual arrangement without a signed writing.   See DNA's

Resp. at 24–25 (noting integration clause and parties' course of conduct previously requiring signed writings to effectuate agreements).  DNA highlights that all of the precedent on which United relies for its novation argument is distinguishable and inapplicable to the present matter given the integration clause in the SCTC.  See, e.g., DNA's Reply at 8 (citing Curry v. Nestle USA, Inc., 225 F.3d 658, 2000 WL 1091490 at *7 (6th Cir. July 27, 2000) ("[W]hen parties intend that their agreement shall be reduced to writing and signed, no contract exists until the written agreement is executed.")); Tr. 59:1–5 (DNA's counsel highlighting that "In not a single case was there a no-waiver or an integration clause or a no-modifications clause that bound the parties that was found to be modified by oral agreement, by conduct or estoppel, or even by informal written agreement if it related to the subject matter between the same parties."); DNA's Supp. Br. at 2–3.  Given that the parties agreed to the integration provision in the SCTC, and there is no indication that DNA waived its right to demand a signed writing for any changes to the parties' contractual arrangement, United's argument must also fail due to its inability to persuade the court that DNA consented to novation absent such a signed writing.

United's attempt to claim that the Email Exchange involved the necessary "signed writing" strains credulity.  See, e.g., United's Resp. at 27–28 (citing Young Heating & Cooling Co. v. J.O.A. Const. Co., No. 06-cv-10374, 2007 WL 1452907 (E.D. Mich. May 15, 2007), for proposition that emails may suffice to modify contract despite provisions requiring a signed writing); United's Supp. Br. at 4–5.  As DNA explains, Young is factually distinguishable and does not support United's position that the parties' contract here could be modified without a signed writing despite the express integration provision

in the SCTC.  See DNA's Supp. Br. at 3 (clarifying that "in Young, the court looked first to existing contract language, before ultimately finding the parties' conduct following execution of a Memorandum of Understanding ('MOU') supported an enforceable new agreement, only because (i) the MOU's subject matter was explicitly excluded from the scope of the pre-existing contract whose terms would otherwise govern and (ii) the earlier contract involved different parties").  Similarly, United's reliance on other cases, such as Durm v. Igor Holdings US LLC, No. 20-cv-0298, 2022 WL 219323 (N.D. Oh. Jan. 24, 2022), for the proposition that email signatures may qualify as a "signed writing" is also unavailing, as those decisions involve the formation of a contract notably via "click-through" agreements, which involve entirely distinguishable terms, conditions, and course of conduct in the parties' contracting negotiations.  See DNA's Supp. Br. at 5 (explaining that Durm and another similar case cited by United "deal with contract formation and their e-signatures amounted to assent to be bound—a different legal hurdle than purported satisfaction of a binding contract's signed instrument requirement via email exchange without so much as a box to check 'I agree.'").  The court agrees that those cases do not support United's argument against the application of the SCTC's express integration provision.  Ultimately, the court is unpersuaded by United's arguments that the Monroe Meeting and Email Exchange resulted in a valid novation in light of the express terms of the SCTC.

Given all of the above, the court rejects United's contention that the Monroe Meeting and Email Exchange could have resulted in a novation absent a signed writing akin to those executed in each Addendum Agreement.  United's claim of novation based

on the Monroe Meeting and Email Exchange also cannot survive scrutiny against the express language of the SCTC.  Accordingly, the court rejects United's arguments relying on a purported January 2018 novation.[6]

Accepting the possibility that the court may reject the novation argument, United provides yet another alternative theory as to why it should not be liable on DNA's counterclaim under the 2017 Contract, maintaining that DNA is estopped from recovering against United due to DNA's post-breach conduct.  See United's Mot. at 35–36 ("Even if United's requirements obligations, if any, with respect to the three migrated systems were somehow not extinguished as a matter of law by virtue of novation," DNA's representations to United in early 2018 that it wanted to maintain to business relationship means that DNA is "estopped from reversing course.").  Specifically, United argues that the parties' discussions in early 2018 included multiple representations from DNA that it wished to "continue to do business together" despite United's transition of some purchases to a third-party supplier.  Id.  United maintains that it "relied on these undertakings to move to a new supplier as to three of its systems but continue purchasing 100% of its extrusions for the others from DNA and even increasing overall purchases, in the expectation that DNA would hold up its end of the bargain."  Id.

---

[6] DNA proffers several other arguments as to why United cannot prevail that the court need not reach as it agrees with DNA that United cannot sustain its argument as to a novation given the lack of consideration.  See, e.g., DNA's Resp. at 23–24 (arguing that United cannot demonstrate that prior contractual arrangement was "completely disregarded" after January 2018, and that United relies on material facts in dispute to establish DNA's purported consent).

Court No. 2:19-cv-06819                                                    Page 34

DNA responds that estoppel simply does not apply here, as that concept only applies "when the acts and conduct of a party are inconsistent with an intent to claim a right, and have been such as to mislead the other party to his prejudice and thereby estop the party having the right from insisting upon it."  DNA's Resp. at 28 (quoting Kendell v. Phx. Home Health Care Servs., 720 F. App'x 249, 252 (6th Cir. 2017)).  DNA maintains that the "record has ample evidence that DNA acted within its rights to enforce the 2017 Contract and was permitted to try to convince United to retract its repudiation."  Id. at 29 (citing DNA's Stmt. ¶ 47 & RC 1302.68(A)).  DNA further argues that United's cherry-picked quotations from the Email Exchange suggesting that DNA abandoned its claim for breach of the 2017 Contract do not suffice to raise a genuine issue of material fact as to whether DNA should be estopped from recovering on its counterclaim.  See id. at 30 (citing DNA's Stmt. ¶¶ 36, 41, 55); see also United's Stmt. Resp. ¶¶ 36, 41, 55.

DNA highlights that United's estoppel argument hinges on two facts: "(i) DNA gave United an award for its performance at the Monroe Meeting; and (ii) DNA paid United the 2017 rebate."  DNA's Reply at 7 (internal citation omitted).  DNA contends, however, that both actions were "wholly consistent with the 2017 Contract and can't show estoppel."  Id. DNA explains that:

> At the time of both events—the Monroe Meeting and the 2017 rebate payment—United had only threatened to move its business to [a third party supplier], or in other words, anticipatorily repudiated the 2017 Contract. United did not carry through on that threat until later into 2018. Indeed, upon repudiation, the aggrieved party may suspend his own performance while he negotiates with, or awaits performance by, the other party.

Id. (citing R.C. § 1302.68, cmt. 1, and Benatty Corp., No. 94-CA-12, 1994 WL 668103, at *2).  United, for its part, clings to its selective quotations from the Email Exchange to suggest that there may be an issue of fact as to whether DNA's representations induced reliance and justify the application of estoppel.  See United's Reply at 13–15 (arguing that evidence of detrimental reliance exists here where "United manifestly relied on DNA's statements and changed its position by proceeding with moving the supply for three systems to Vision while keeping three systems with DNA and taking no steps whatsoever to embark on the costly and time-consuming task of redesigning and retooling of those three systems for transfer to a new supplier").

The court cannot agree with United that its estoppel argument has any merit, much less raises a genuine issue of material fact. As DNA explains, and United fails to rebut, Ohio law permits an aggrieved party to suspend or attempt to re-negotiate performance by the breaching party.  United has failed to persuade the court that DNA's statements and actions here went beyond what DNA was entitled to do to as an aggrieved party to a breach of contract under Ohio law.  Even taking all factual inferences in United's favor, the court cannot agree that the record supports the conclusion that DNA is estopped from recovering on its counterclaim.  Accordingly, the court rejects United's arguments as to why the events and the parties' course of conduct following United's Fall 2017 anticipatory breach do not vitiate liability to DNA on the 2017 Contract.

Lastly, DNA maintains that it has suffered damages in the form of lost profits as a result of United's breach.  See DNA's Mot. at 20–22; DNA's Stmt. ¶¶ 74–76 (providing DNA's lost profit damage calculations).  United argues that DNA failed to adequately

prove or plead its damages, highlighting various issues with DNA's proposed proofs as to its requested lost profits.  <u>See</u> United's Resp. at 34–39.  The court agrees with United that some factual issues exist as to the quantum of damages that merit further proceedings and preclude a complete grant of summary judgment in Defendant's favor. However, United is unable to reasonably maintain that DNA did not suffer <u>any</u> compensable damages as a result of United's breach given the uncontested facts.  <u>See generally id.</u> ("At the very least, therefore, there is an issue of fact as to the proper measure of DNA's lost-profit damages.").  Accordingly, the court concludes that DNA is entitled to judgment in its favor as to the issue of liability on its counterclaim.  For the reasons provided more fully in Section III.D below, the court will reserve judgment as to the quantum of damages that DNA is owed.

### C. United's Motion for Summary Judgment

The court now turns to the events of 2018 to determine the legal consequences of the Monroe Meeting and the Email Exchange.  As the court drew all factual inferences in Plaintiff's favor with respect to DNA's affirmative motion for summary judgment, here conversely the court draws all factual inferences in Defendant's favor.  <u>See</u> <u>supra</u> Section I (citing <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970)).  Given that Plaintiff could not prevail on its arguments against DNA's motion for summary judgment for the reasons provided in the prior section, it should be rather clear that Plaintiff cannot prevail on its affirmative summary judgment motion even without the additional burden of persuasion.

As recited above, to prevail on a breach of contract claim under Ohio law, the claimant must establish by a preponderance of the evidence that: (1) a contract existed; (2) the claimant fulfilled its obligations; (3) the defendant breached its obligations; and (4) damages resulted from this breach.  See United's Mot. at 38–39 (citing Quest Workforce Sols., L.L.C. v. Jobi USA, 2016-Ohio-8380, 75 N.E.3d 1020, 1030 (Ohio Ct. App. 2016)).  Here, United's claim hinges on the existence of a "January 2018 Agreement" in which "DNA specifically agreed that, as long as the parties continued to do business with each other in 2018, United would be entitled to a rebate pursuant to the rebate schedule found in the April 2017 Rebate Addendum."  Id.  United maintains that "[a]dhering completely to the January 2018 Agreement, United in fact made purchases totaling $8,733,754 in 2018 from DNA, entitling it to a rebate totaling $570,294."  Id. at 39.[7]

DNA correctly notes that United's entire argument in support of its partial motion for summary judgment hinges on the validity of the purported "January 2018 Agreement." See DNA's Mot. at 22–30.  "To declare the existence of a contract," the proponent of a contract must show that (1) "the parties to the contract must consent to its terms," (2) "there must be a meeting of the minds of both parties," and (3) "the contract must be definite and certain."  Id. at 24 (quoting Purdin, No. CA 531, 1993 WL 19508, at *3).  DNA

---

[7] Although Plaintiff filed a Supplemental Complaint supplementing its claims with a Fourth Count seeking "[c]ompensatory damages in the amount of $361,936.20" arising from rebate amounts earned during the year 2019 in accordance with the terms of the 2017 Rebate Addendum, Plaintiff makes no argument as to that claim in the present motion. See generally United's Mot at. 37–40 (seeking summary judgment only on "the Third Count of its Complaint").  The court therefore does not reach United's claim as to rebates owed for purchases in 2019.

explains that the terms of the January 2018 Monroe Meeting and Email Exchange were not sufficiently definite to create an enforceable agreement.  DNA Reply at 10.

United argues that in the Email Exchange the parties agreed upon some "essential terms necessary for the business relationship: (1) United would stop buying three systems from DNA sometime in 2018 but continue to buy 100% of the three remaining systems from DNA 'as long as' the parties felt 'comfortable;' (2) the rebate structure referenced to the July 2017 Rebate Addendum would govern future rebates and in particular with respect to 2018 sales; and (3) previously agreed upon terms as to pricing and lead time would remain in effect."  United's Mot. at 23.  DNA seizes on the fact that an agreement conditioned on the parties "feeling comfortable" lacks sufficient meaning to establish an intent to be bound as required under Ohio law.  See DNA's Reply at 10 (citing Bass, Hurwitz & Poliner, CPAs v. State, Nos. 88AP-1120, 89AP-16, 1989 WL 87078 (Ohio Ct. App. Aug. 3, 1989), and Alligood v. Proctor & Gamble Co., 72 Ohio App. 3d 309, 312 (Ohio Ct. App. 1991)).  In response, United reiterates its argument that "contracts that terminate if either party decides to stop purchasing or supplying the products are recognized and are not illusory, as long as they are not one-sided, and such contracts can be terminated upon proper notice."  United's Supp. Br. at 3 (internal citations and quotation marks omitted).  United's arguments, however, ignore various express provisions in the SCTC limiting the parties' termination rights and requiring a specified amount of notice.  See, e.g., 2012 SCTC ¶¶ 14, 15.2, 15.5, 15.8.  United's reliance on precedent involving terminable-at-will contracts is unavailing given the terms of the SCTC already discussed in this opinion.  See, e.g., supra at pp. 23–26 (concluding that parties'

Court No. 2:19-cv-06819                                                    Page 39

contractual arrangement included express termination provision prohibiting conclusion that contract was terminable-at-will).  The court agrees with DNA that United has failed to establish that the terms of the purported January 2018 Agreement were sufficiently definite to constitute an enforceable agreement, much less a valid novation.

DNA concisely explains why United's partial motion for summary judgment on its 2018 rebate claims must fail:

> United seeks summary judgment on its claim for the 2018 sales rebate. United bases this claim on the "terms" of the January 2018 Negotiations being a binding agreement and a subsequent breach of that new "agreement" by DNA. United's offensive summary judgment efforts fail for some basic reasons. As set forth in [DNA's] moving brief, United committed a breach of the 2017 Contract when it ceased purchasing all of its vinyl requirements from DNA, mere months after the contract's execution, thereby excusing DNA's future performance. As such, United's Motion for Summary Judgment based upon entitlement to the 2018 rebate fails.

DNA Resp. at 30 (internal citation omitted).

DNA contends that if the court accepts DNA's arguments on the merits, the court can reject Plaintiff's partial summary judgment motion as meritless given as "[o]nce United materially breached the 2017 Contract by agreeing to purchase product from one of DNA's competitors, DNA was excused from its performance under the 2017 Contract relating to rebate payments and was therefore justified in not paying rebates to United in 2018."  DNA's Reply at 15 (noting that "[i]t is black letter contract law that one party's material breach excuses the other party from performing," citing <u>Jackson v. State Farm Fire & Cas. Co.</u>, 461 F. App'x 422, 426 (6th Cir. 2012)).  The court agrees.  United, in its

own motion, recognizes that "[a] material breach normally excuses the non-breaching party's obligation to continue performing on the contract."   United's Mot. at 37 (citing Roach v. BM Motoring, LLC, 228 N.J. 163, 174 (2017) and Waste Mgmt., Inc. v. Rice Danis Indus. Corp., 257 F. Supp. 2d 1076, 1084 (S.D. Ohio 2003)).  Given that the court has concluded that United materially breached the terms of the parties' contractual arrangement in Fall of 2017, United cannot prevail on its claim for a subsequent breach by DNA on that same contract.  Similarly, as the court has rejected United's contention that the Monroe Meeting and the 2018 Email Exchange resulted in a novation to the parties' agreement along the terms United describes, United's alternative argument fails as well.

As the court determines that United first materially breached the parties' contractual arrangement in the Fall of 2017, United cannot prevail on its claim with respect to the sales rebate earned in 2018.  The court will therefore deny Plaintiff's motion for partial summary judgment.

### D. Damages

Having concluded that United is liable for breach of contract (and that DNA is not liable on United's claims), the issue of what damages are owed remains.  DNA maintains that the amount of damages owed is straightforward as it is calculated based on lost profits starting from 2018 (when United first started purchasing extrusions from a third party) through the end of 2022 (the end date for the term of the Rebate Addendum).  See DNA's Mot. at 10.  Using data obtained from United's records, DNA's Chief Financial Officer, Daniel Hoelting, calculated that in that time period "DNA suffered lost profits in

Court No. 2:19-cv-06819                                                    Page 41

the amount of $22,832,089.00." Id. at 11.  In addition to those lost profit damages, DNA also seeks an additional $189,000.64 for unpaid invoices.  Id.

United contends that DNA has not provided sufficient evidence to calculate with certainty what the net lost profit amounts were for years 2021 and 2022.  See United's Resp. at 34.  Further, United takes issue with DNA's apparent reliance on gross profits rather than net profits for the basis of its damage calculations.  Id. at 35–39.  United also challenges DNA's attempt to include a claim of damages for unpaid invoices, arguing that DNA failed to include allegations of such non-payment in its Counterclaim.  Id. at 39 (maintaining that DNA was required to amend pleading to seek damages on such claim and that it is now too late).

In response, DNA appears to acknowledge that some alterations of its damage calculation may be appropriate, noting that "[e]ven if a portion of DNA's SG&A expenses must be netted from its lost profits, even though they're unrelated to the 2017 Contract, those figures are in the record, and it can be done at trial."  DNA's Reply at 14 n.12 (emphasis added).  Given this apparent acknowledgment of outstanding issues of material fact as to damages, the court will grant summary judgment for DNA as to liability, but reserve decision as to the quantum of damages until after further evidentiary proceedings and discussion with the parties.[8]

---

[8] As noted above, the court concludes that the parties' entered into an enforceable requirements contract with a duration defined by the term of the signed addenda in July of 2017, but the court reserves judgment as to whether the precise effective end date of the parties' contract was in 2019 or 2022.  See Section III.A supra.

Court No. 2:19-cv-06819                                                      Page 42

### IV. Conclusion

For the foregoing reasons, the court denies Plaintiff's motion for partial summary judgment and grants in part Defendant's motion for summary judgment.


/s/ Leo M. Gordon
Leo M. Gordon, Judge
U.S. Court of International Trade
(sitting by designation in the District of New Jersey)


Dated: March 17, 2025
      Newark, New Jersey